# In the United States Court of Federal Claims

No. 06-30T
(Consolidated with No. 06-35T)
(Filed: August 12, 2015)
(Re-filed: January 15, 2016)

* * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| RUSSIAN RECOVERY FUND LTD., RUSSIAN RECOVERY ADVISORS, L.L.C., Tax Matters Partner, | Taxation of partnership; bona fide partnership; 26 U.S.C. § 704; 26 U.S.C. § 721; FPAA; economic substance; step transaction; *Culbertson*; penalties; reasonable reliance on tax advice |

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * *

*Loretta R. Richard*, Boston, MA, with whom were *B. John Williams, Jr.*, Washington, DC, *Alan J. J. Swirski*, Washington, DC, *Kathleen S. Gregor*, Boston, MA and *Nathan P. Wacker*, Washington, DC, for plaintiffs.

*Robert J. Higgins*, United States Department of Justice, Tax Division, Washington, DC, with whom were *Caroline D. Ciraolo*, Acting Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *Bart D. Jeffress*, Trial Attorney, and *Paul G. Galindo*, Trial Attorney, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

This is a Tax Equity and Fiscal Responsibility Act ("TEFRA") action seeking readjustment of partnership items involving what has come to be known as a "DAD" transaction. That is a distressed asset/debt ("DAD")

transaction in which losses suffered by a tax indifferent entity are transferred to a partnership in exchange for an interest in that partnership, followed by the sale of that partnership interest to a tax interested entity that subsequently claims the loss.  The present action is brought under 26 U.S.C. § 6226(a) (2006)[1] by Russian Recovery Advisors, LLC ("RRA" or "plaintiff") as the tax matters partner for Russian Recovery Fund, LTD ("RRF").  Plaintiff alleges that the Internal Revenue Service ("IRS") erred in its October 14, 2005 Notice of Final Partnership Administrative Adjustment for the tax year ending December 31, 2000 ("2000 FPAA") when it disallowed approximately $50 million of the losses RRF claimed on its 2000 partnership return.  Plaintiff also has pending before the Tax Court a challenge to the FPAA disallowing RRF's partnership return for 2004, which claimed losses of $170 million from the same type of assets at issue here.

We have had occasion earlier in this proceeding to rule on a number of procedural and substantive issues.  *See Russian Recovery Fund Ltd. v. United States*, 90 Fed. Cl. 698 (2009) (holding that satisfying jurisdictional deposit requirement of IRC § 6226(e) requires inclusion of all potential increased tax liability for tax years affected by the FPAA); 81 Fed. Cl. 793 (2008) (holding it improper for a 2000 FPAA to adjust an individual partner's amount at risk in its distributive share of non-recourse partnership liabilities).  In our most recent opinion we held that the FPAA suspended the statute of limitations for adjustment of Nancy Zimmerman's 2001 individual tax return, or for any partners she represents, while an extension agreement did not apply to James ("Jim") DiBiase's return, which was filed beyond the FPAA's three-year window.  101 Fed. Cl. 498 (2011).

Trial was held in Washington, DC, from March 30 until April 16, 2015, on the merits of plaintiff's challenge to the FPAA. The trial addressed the merits of the FPAA, namely, whether RRF was entitled to claim built-in losses on disposition of securities derived from Russian sovereign debt.  At the time those assets were placed into the partnership, they had built-in losses of approximately $223 million.  RRF claimed those losses for itself, relying, *inter alia,* on IRC § 721.  The FPAA asserts, in general, that the exchange of partnership shares for those assets was not bona fide.  Also at issue in the trial was whether, assuming the FPAA is upheld, the IRS's imposition of penalties

---

[1] Unless otherwise indicated, all code section references will be to the version of 26 U.S.C. in effect for the relevant time period.

was correct.  For the reasons set out below, we sustain the FPAA, both as to the merits of the claimed loss and as to the imposition of a penalty.

BACKGROUND

This case affords a fascinating window into the world of private hedge funds, more particularly those operated to invest in non-equity instruments, and even more particularly, one fund, RRF, established by Ms. Nancy Zimmerman to capitalize on opportunities created by Russia's 1998 default on its sovereign debt.  The court heard from nine fact witnesses and five experts who made up an interesting array of individuals gifted in terms of insight into finance and investments.

I.     The Transactions

The star of the drama was Ms. Zimmerman, who made a name for herself and a great deal of money for her employers or clients, while still at a relatively tender age.  She impressed the court, just as she must have impressed investors, with the breadth of her knowledge about the operation of international financial markets, the instruments for creating and transferring obligations, and the opportunities afforded for making money on pricing differentials.  Just out of college, she worked for three years in Chicago for O'Connor & Associates, an options trading company, where she made prices on currency options on the floor of the Chicago Mercantile Exchange.  From there she went to New York City and took a position at Goldman Sachs.  There she priced and traded in Treasury bonds and options on U.S. debt instruments as well as mortgages.  She supervised a small staff of employees in New York and overseas.  She was later a vice president as well as an executive director at Goldman Sachs International in London.  Her immediate supervisor was Jon Corzine.  She developed an expertise in finding market opportunities and exploiting them by constructing risk systems, basically exploiting pricing inefficiencies in global fixed income markets.  Eventually Ms. Zimmerman decided to venture out on her own.

Initially she partnered with an existing investment company called Farallon Capital Partners, which provided seed funding in return for a minority stake in a new management company, Farallon Fixed Income Associates, for which Farallon did the accounting, legal work, and marketing.  Ms. Zimmerman was responsible for the investment program and for the investment staff.

In 1998, Ms. Zimmerman and a partner, Gabriel Sunshine, decided to buy out Farallon's interest in Farallon Fixed Income Associates and distributed that interest to Farallon Fixed Income Partners.  On January 1, 1999, Ms. Zimmerman and Mr. Sunshine parted ways with Farallon Capital Partners and renamed their management company as Bracebridge Capital ("Bracebridge"),[2] which eventually would become the management company for FFIP[3] (a fund), which in turn is one of a number of interconnected hedge funds.  RRA was later formed as a management group for the Russian Recovery Fund.  Bracebridge and its associated funds had approximately $600 million under management at the end of its first year of operation and has approximately $10 billion under management today.

One of Bracebridge's key employees and someone who testified at length on behalf of RRF was James DiBiase.  He was hired by Bracebridge in 1998 to run all of the non-investment aspects of the firm.  He became a partner and ran the "back office" and held the title of CFO until 2007, when he ceased being a partner and became an employee, which he remains to the present.

In 1998, Bracebridge created several funds, one of which was RRF.  RRF was established as a Cayman Islands limited liability corporation, but it elected to be taxed in the United States as a partnership.  The purpose of RRF was to extract value from distressed Russian assets.

When the government of the Russian Federation defaulted on all of its sovereign debt obligations in 1998, instruments issued by Russia, or derivative of such instruments, lost virtually all of their value.  The ruble also collapsed and was no longer freely traded due to currency exchange limitations imposed by the Russian Central Bank.  Further complicating matters for holders of Russian debt was that the Russian government only recognized a limited number of large international banks, so-called "S account holders," as intermediaries to access the debt or to trade in rubles.  In the wreckage, Ms.

---

[2] Although Bracebridge technically did not exist prior to 1999, the witnesses at trial referred to Ms. Zimmerman's management company as Bracebridge instead of Farallon Fixed Income Associates in the period after she and Mr. Sunshine bought out Farallon's interest.

[3] FFIP was originally an acronym rooted in the naming scheme developed by Farallon Capital Partners.  However, in this context, FFIP is not an acronym but the name of a Bracebridge fund.

Zimmerman, who had experience with foreign currency instruments, including Russian debt, saw an opportunity.  As she explained:

> So all we were left with were these unhedged, completely crushed assets.  And . . . it seemed best if we could give -- take all of the stock that was just a bet on will Russia recover, will you get more than four cents for these, and put them off to the one side and let investors, institutional investors, when we talked to them decide, you know, do you want these or not because, you know, maybe somebody could stand in your shoes and take these Russian assets because they're not all in the RRF . . . .

> And we also thought that we'd have to -- there would be these Russian -- there would be ways to create value to get out of the S-accounts and that we probably could make some money doing that.  We thought there was a lot of value there and that if we could -- you know, we were going to pay attention.  Maybe we could get some people to give us cash and try and buy things or, better yet, to get people to just contribute in kind, to give us their problem assets, and then we would have scale, we'd have some economies of scale, in administrating and following the day in, day out developments around how to get out of the S-accounts and to come up with some techniques to leave the S-accounts.

> And you know, right at that moment, my best recollection is that a restricted ruble traded at about someplace around 25 percent of a fully trade -- a fully convertible ruble, so, you know, it seemed like that was a dislocation in that even if you could exploit that piece of it without the ruble being worth a lot more in the future that you could have a very handsome return.

Tr. 642-44.

In sum, Ms. Zimmerman, who controlled Bracebridge, believed that she could make money for herself and investors by obtaining devalued Russian debt at pennies on the dollar in anticipation of a recovery of the ruble and hence something approaching face value of debt instruments.  Given the depressed nature of the debt (most had lost over 90% of their value), even

small increases would be highly leveraged.  Bracebridge therefore created RRF in late 1998 as a Cayman Islands limited liability company.  Bracebridge also created Russian Recovery Advisors as a separate management company to guide RRF, through which Ms. Zimmerman also hoped to make money through management fees.

Most relevant to this litigation was a financial instrument known as a "credit-linked note" or "CLN."  These instruments were derivative of Russian sovereign debt and could only be issued by S account holders.  Because non-Russian hedge funds, such as RRF, were not eligible to own ruble-denominated Russian Federation obligations directly, they could gain economic exposure to Russian Federation debt instruments only through credit derivative swap transactions memorialized in these credit-linked notes.  The authorized bank retained legal title to the bonds but would swap all of the economic risk and benefit to a third party, such as a hedge fund, for cash or some other form of consideration.  DX 193 at 1-2 n.1 (letter summarizing Christopher C. Lucas's expert opinion).[4]

Transactions in Russian debt and derivatives were handled by an organized exchange known as the Moscow Interbank Currency Exchange, or MICEX.  Two of the types of instruments traded on the MICEX, and which figured in the trial, were GKOs,[5] discounted debt instruments issued by the Russian Federation, and OFZs,[6] which are floating rate, coupon-bearing bonds, also issued by the Russian government.

Bracebridge began marketing efforts at the end on 1998 to try to obtain investors that were willing to contribute either assets in kind or cash in exchange for an interest in the RRF partnership.  The person primarily responsible at Bracebridge for doing this marketing was Jonathan Grenzke,

---

[4] "DX" refers to defendant's trial exhibits.  "PX" stands for plaintiff's trial exhibits.  "JX" refers to those exhibits offered by the parties jointly.  The page citations follow the internal pagination scheme for each exhibit, most of which are Bates numbers.

[5] An acronym for the transliterated Russian, "Gosudarstvennoye Kratkosrochnoye Obyazatyelstvo."

[6] An acronym for the transliterated Russian, "Obligatsyi Federal'novo Zaima."

who testified at trial. Although the government seeks to cast doubt on the bona fides of the marketing effort, we are persuaded that Mr. Grenzke did in fact undertake a serious campaign, at least initially, to bring in investors. The marketing campaign, was not much of a success, however. With the exception of the Tiger transaction which we will examine shortly, there were only a relatively small number of investments into RRF, and those were principally by Bracebridge-controlled entities and a few colleges.[7]

The offering memorandum RRF used to solicit potential investors required participants to agree to stay in the fund for at least three years unless the fund appreciated over 100%, in which case a partial redemption was possible. Investors were warned that the fund was only suitable for those "who have no need for liquidity with respect to their investment." JX 32 at 219. They were also warned that shares could not be transferred without approval of the Board of Directors, which could be withheld for any reason.

The serious marketing efforts lasted about six months, from the end of 1998 until June 1999. At that point, although RRF continued to exist, proactive marketing seems to have come to an end. Defendant argues that what happened in May and June 1999, events we explore below, account for the loss of interest in marketing.

Two other actors must be introduced. Tiger Management, LLC ("Tiger"), was one of the world's largest managers of hedge funds in 1998-1999, with over $20 billion under management. It was run by Julian Robertson. Two of the funds that Tiger managed, Jaguar and Ocelot, figure in this action. Both were hedge funds organized as foreign partnerships that did not pay taxes in the United States (Cayman Islands and Netherlands Antilles, respectively). Before the Russian collapse, Jaguar and Ocelot had purchased CLN's which were derivatives of OFZs[8] for the combined sum of over $230 million. Collectively, we refer to these two funds as "Tiger" or the

---

[7] The court is left with the distinct impression that these smaller investors were window-dressing in the sense that the large target investors would have been reluctant to be the first to invest.

[8] At this time, Jaguar and Ocelot also purchased other Russian-based securities, which do not feature in the issues of this case. Likewise, the Tiger fund itself, as well as other Tiger-controlled hedge funds also invested in Russian securities during this period.

"Tiger funds," and the securities as the "Tiger securities."  As an S account holder authorized to do business on the MICEX, Deutsche Bank brokered those purchases as Tiger's counter-party.[9]  Among the particular series of OFZs that plaintiff ultimately obtained from Tiger were the series OFZ 25023 ("25023s"), which had a maturity date of September 12, 2001.  After the collapse, these assets were worth less than 10% of what Tiger had originally invested.  Because Tiger was a foreign company, however, it could not take advantage of United States tax laws that permit a deduction against income in the amount of claimed losses on the 25023s.

Two Deutsche Bank employees who figure in the transactions relevant to this suit are Jay Johnston, a salesman for Deutsche Bank with respect to "emerging market" instruments, and Laurence Schreiber, who at the time was managing director of Deutsche Bank's emerging markets derivatives structuring business.  Deutsche Bank put RRF in touch with Tiger, and later served as the liaison between RRF and Tiger to consummate the transfer of the OFZ 25023s and to secure issuance of RRF partnership shares.

An email string between Messrs. DiBiase and Grenzke dated March 9, 1999, relates to a potential contribution of assets to RRF.  JX 15.  This was at a time when the fund had no assets.  Interest was expressed in the views of Citco, RRF's Cayman Islands transfer agent, and Ernst & Young ("E & Y"), RRF's accountants, about the fund.  At one point Mr. Grenzke makes reference to Deutsche Bank contributing shares of unspecified securities in kind to RRF.  The question raised was whether the contributor would be concerned about the absence of other partners.  Mr. Grenzke proposed that it would be easy to have FFIP become a partner, along with, perhaps, one other Bracebridge-controlled entity.  This email foreshadowed events to come because FFIP did in fact contribute the first assets to RRF in April 1999.

Mr. DiBiase professed no recall about the subject of this series of emails.  We find this lack of recall implausible. The concerns expressed in these emails plainly relate to the transactions culminating in Tiger's later contribution of Russian assets to RRF, facilitated by Deutsche Bank, and his recall on later elements of the transaction was extensive.  Mr. DiBiase was

---

[9] Only certain entities licensed by the Russian government were permitted to transact business in ruble-denominated instruments in their own name.  Deutsche Bank was such an entity.  The Tiger funds were not.

prepped over 16 hours for his trial testimony. He has been a certified public accountant, and began his career working in the tax division of Price Waterhouse, where he eventually became a senior accountant and later a manager. Throughout his seven years at the firm, he was responsible for preparing corporate and individual income tax returns. After leaving Price Waterhouse, he spent eight years at Scudder Stevens, an investment firm, beginning as a tax manager and ending as a director. Throughout his time there, he worked on tax-related matters. He plainly was well-versed in the tax-related interests of partners in hedge funds, and he had good recall about events on direct examination. In short, we are persuaded he was familiar with the subject of these emails.

Mr. DiBiase denied knowledge of any involvement between Tiger and Bracebridge in March of 1999. He was then shown DX 9, a telephone list defendant obtained from plaintiff during discovery. It was circulated on March 10, 1999, and contains the names of fourteen individuals, all of whom figure in a series of transactions that unfolded in May and June between Tiger, RRF, and General Cigar Corporation ("General Cigar"). DX 9. The list contained contact information for three key Bracebridge players (Ms. Zimmerman, Mr. Grenzke, and Mr. DiBiase); two Deutsche Bank representatives (Mr. Schreiber and Francesco Piovanetti); the lawyers representing RRF, Citco (RRF's Cayman Island transfer agent), and Tiger Funds; along with the name of Anu Murgai, a trade executor for Tiger. Once again we are not persuaded by Mr. DiBiase's disavowal of knowledge.

In a March 11, 1999 instant message to Mr. Piovanetti of Deutsche Bank, Laurence Schreiber asked Mr. Piovanetti to inquire of Jim DiBiase when RRF would be launched. JX 19. As Mr. DiBiase testified, Mr. Piovanetti would call periodically during this time frame to see if RRF had launched.

In March of 1999, Deutsche Bank prepared a tax shelter registration under its own name for an entity to be called "Preferred Stock Financing Transaction," a generic name place holder. DX 11 at 43. The source of the assets for the transaction was to be a company in the Cayman Islands. *Id*. at 45-46. The assets would be heavily depreciated and would be acquired in exchange for common or preferred shares of stock. The transaction was anticipated to occur before the end of May 1999.

Shortly thereafter, on April 4th, Mr. Piovanetti sent a message to Ms. Zimmerman, indicating that he would be sending details shortly about an unspecified transaction. Mr. Piovanetti did not testify at trial, and Ms. Zimmerman testified she did not recall what the subject was of the message. On April 7th, Mr. Piovanetti sent an email message to his Deutsche Bank colleague, Jay Johnson, mentioning an upcoming conference call, after which representatives of General Cigar would be visiting the Deutsche Bank offices to discuss "the Russian trade." DX 15.

We know that General Cigar was in the market as early as April 1999 for investments in depreciated Russian assets and that it had been approached that month by both Deutsche Bank representatives and by Ms. Zimmerman.[10] Moreover, the minutes of the Board of Directors of General Cigar, dated April 20, 1999, DX 20, reflect a decision to invest up to $25 million in deeply discounted, high-yield instruments and show that the company was looking at strategies to generate tax benefits for the company through these investments. During this time period, Mr. Schreiber began sending Janet Krajewski, the Vice President of Taxes at General Cigar, periodic updates on the MICEX price for the OFZ 25023s. DX 23. It is undisputed that the company shortly thereafter invested approximately $3 million in other Russian securities and later, in June, spent approximately $21 million to acquire RRF's Tiger securities (the OFZ 25023s).

On April 30, 1999, an email from Mr. DiBiase to Ms. Zimmerman inquired whether RRF was planning to take its typical 2% up-front management fee in connection with the assets that Deutsche Bank or its client was planning to invest. Apparently, Deutsche Bank was under the impression that no up-front fee would be charged, although Ms. Zimmerman had quoted a figure of $1 million. Deutsche Bank was willing to pay $300,000, which would be 2% of $15 million. When asked about the email, Mr. DiBiase once again said the email did not 'ring a bell,' and that he had no recollection that Deutsche Bank was going to put assets into RRF.

Later that same day, in an email to Ms. Zimmerman, Mr. DiBiase reflects concern about the composition of investors in RRF: "We will need to

---

[10] An email dated April 21, 1999, from Ms. Zimmerman to Mr. Grenzke seeks contact information for General Cigar: "Did the Cigar guys give you cards[?] I only have tax ladies." JX 28.

[represent] as to what % of RRF (i.e., FFIP) is owned by individuals.  Needs to be a high number, like 70-80%.   This means we cannot put FYI or S assets into RRF until after the db [Deutsche Bank] deal."  DX 25.  Mr. DiBiase's purported ignorance of the import of "the db deal" in this and other emails from this period is unconvincing.

DX 29 is an email dated May 14, 1999, from Mr. DiBiase to Ms. Zimmerman concerning the composition of partners in RRF.  The question addressed is whether corporations could join.  Apparently Deutsche Bank wanted some assurances that corporations would not be included in RRF out of a concern for preserving the tax characteristics of assets contributed to the fund.  Mr. DiBiase writes, "Nothing in the docs prevents us from putting in corps [sic] but it could possibly impair one of our most valuable assets."  DX 29.  Mr. DiBiase testified that the "most valuable asset" referred to was the built-in losses in Russian depreciated assets that might end up in RRF.  Even before the transfer by Tiger, in other words, Mr. DiBiase was aware that acquiring the Tiger assets would produce value in excess of the nominal pricing of the transaction because of the tax benefits of the imbedded losses.  There can be no mystery about RRF's intentions at this point, which was to obtain Tiger's depreciated assets for their tax value.

The May 14 email, as well as Mr. DiBiase's somewhat reluctant explanation of its meaning, suggests that RRF principals were keenly aware of the need to structure the Tiger acquisition in such a way that it did not impair the ability of downstream buyers to obtain the built-in losses.  The presence of corporations, according to Mr. DiBiase, might preclude later resale to tax-interested buyers.  This is made crystal clear in an email dated July 23, 1999.  In recapping events for Jon Grenzke, Mr. DiBiase writes that "we didn't want rrf to have significant level of corporate ownership since people interested in buying tax losses don't want to transact with corporations."  DX 111.  Mr. DiBiase was thus less than candid when asked during cross examination what the structural reasons were for the statement in JX 73; "[Deutsche Bank's] clients would only sell to a domestic partnership such as FFIP, or one similarly structured."  His answer, "I don't recall," is not credible.  Tr. 463.  In other words, at the time Tiger joined the fund, RRF was already planning to use the built-in tax losses it stood to gain from the Tiger assets.

Three transactions occurred within quick succession in May and June of 1999.  The first occurred some time between May 20 and May 25, 1999.  This was the transfer by Tiger of OFZ 25203's to RRF in exchange for shares

in the hedge fund worth approximately $14.9 million.  At trial, there was conflicting evidence about the precise date of the transaction.  Plaintiff takes the position that it was May 20, 1999; defendant argues that the transaction was not consummated until May 25.  Nothing of formal legal consequence turns on this issue, but the optics for plaintiff are even less attractive if Tiger was only a partner for ten days instead of fourteen,[11] particularly when one

---

[11] Jaguar and Ocelot each submitted to RRF a signed subscription agreement that bore the date of May 20, 1999.  JX 65 at 522; JX 66 at 581. Also on May 20, 1999, Tiger and RRF executed the assignment and assumption agreement that transferred ownership of the Russian securities from Tiger to RRF.   JX 52; JX 53; JX 54; JX 55; JX 56.  A Bloomberg message and RRF's internal documents show that Tiger contributed the assets on May 20, 1999, and from that date RRF viewed itself as the owner.  JX 121; PX 33 at 2530.   The Tiger funds' internal documentation reflects a contribution date of May 24.

While the documents show that Jaguar and Ocelot executed the assignment and assumption agreement, transferred their ownership in the Russian assets, and signed the subscription agreement on May 20, 1999, these actions alone did not fulfill the conditions of becoming a partner as described in the subscription agreement.   By the terms of that agreement, "This subscription may be rejected by [RRF] in whole or in part in the sole discretion of the Board of Directors . . . at any time prior to acceptance. . . .  The undersigned understands that for [RRF] to consider its subscription, the undersigned must complete fully this Subscription Agreement and . . . promptly return them . . . ."  JX 65 at 506; JX 66 at 565.  Although Jaguar and Ocelot each signed its subscription agreement on May 20, those subscription agreements were not completed by Jaguar or Ocelot until May 21, 1999, which is the date that both entities initialed a previously missing certification.  DX 38; *compare* JX 58 at 109 *with* JX 65 at 517 (Ocelot); *compare* JX 59 at 156 *with* JX 66 at 576 (Jaguar).  Although plaintiff takes the view that May 20 is the proper date for treating the Tiger funds as members of the partnership, a May 21 email from Margery Neale, an attorney for Swidler Berlin, who represented RRF, to Mr. DiBiase indicates that a vote of all the partners had not yet been taken on accepting the Tiger Fund entities as new partners. Further delaying the execution of the subscription agreement, RRF and its Administrator did not sign and accept the subscription agreement or side letters until May 25, 1999.  *See* JX 63; JX 64.  Thus, although Tiger began the
(continued...)

considers that the process of selling its interests—the next step in the series of transactions—had begun, as we shall see below, no later than June 1.

Tiger had been sent a standard RRF offering memorandum spelling out the terms under which RRF invited an entity like Tiger to become a partner. This included the three year limitation on redemption mentioned above along with restrictions on transferability of shares. It also received a subscription agreement by which Tiger and RRF would agree to entry into the partnership by Tiger, subject to those same limitations. The testimony of William Goodell, counsel for Tiger, makes it clear that Tiger would not sign the subscription agreement unless it received a dispensation from the three year waiting period. To solve that problem, Tiger and RRF executed a "side letter" on May 25, 1999, by which Tiger was given unique redemption rights. Instead of having to wait three years, the side letter allowed Tiger to redeem its shares on or after July 1, 1999, in exchange for cash or assets "in kind." This change had been the subject of back and forth negotiations, during which Tiger specifically rejected RRF's proposed compromise date of April 15, 2000.

Tiger also refused to certify, as required in the subscription agreement, that its purpose for entering into the fund was "investment." Accordingly, with RRF's agreement, the final subscription agreement omits the standard language: "the Shares subscribed for hereby are being acquired by the undersigned for investment purposes only, . . . and not with the view to any resale or distribution thereof . . . ." JX 24 at 469 (standard subscription agreement). Tiger signed the modified subscription agreement[12] on May 20, 1999, and RRF approved its entry some time on or before May 25, 1999.

The subscription agreement required Tiger to represent its basis in the Russian assets it transferred. These were shown to be approximately $230 million. The final subscription agreements also contained a representation by RRF that it would not make a section 754 election, which would have resulted in a change of basis to fair market value.

---

[11](...continued)
process of joining the RRF partnership on May 20, 1999, it was not accepted into the partnership until May 25, 1999.

[12] There were actually two versions of all the entry documents, one for the Jaguar Fund and another set for the Ocelot Fund. Both were controlled by Tiger Fund and we refer to them both as "Tiger."

The second transaction was Tiger's sale of its RRF shares to FFIP. As early as May 24, 1999, Tiger had made it clear, at least internally, that it planned to sell its RRF shares for cash:

> [W]e sold all of our sep 2001 bonds (that we had . . . with deutsche bank) in return for equity in the russian recovery fund. [T]he value of the equity at the time we received it was 14mm dollars. [H]owever, we plan to sell in equity in 2 weeks to hopefully receive cahs [sic].

DX 43. There is no question that this email from Ms. Murgai, dated May 24 (arguably before the day the transaction was complete) was referring to the OFZ 25023s. In another internal communication the next day, Robert Bastone of Tiger records that:

> Jaguar and Ocelot Cayman have assigned their interests in Russian 9/12/01 OFZ's (held with Deutsche Bank) to a private fund called the Russian Recovery Fund. . . . The current value of the fund is approximately $14 million dollars. We hope to have private fund shares sold, vs. cash, in approximately two weeks. Update to follow.

DX 46.

Tiger's efforts to dispose of its new partnership shares began almost immediately. On June 1, 1999, Jim DiBiase sent a memo to RRF's files documenting a conversation with Laurence Schreiber, in which he reports that Mr. Schreiber informed him that the Tiger funds were "offering their shares of RRF at a slight discount to their original subscription price (roughly $14.09 million versus $14.81 million). He asked if FFIP, L.P. ("FFIP"), one of the current shareholders of RRF, would be interested in purchasing these shares at this price level." JX 73. Mr. DiBiase testified that he assumed this contact must have been preceded by a conversation between Ms. Zimmerman and Mr. Schreiber. The memo goes on to ascribe to Deutsche Bank the instruction that, "for certain structural reasons, his clients would only sell to a domestic partnership such as FFIP, or one similarly structured . . . ." *Id.*

14

Even a cursory review of a fax dated June 1, 1999, from Laurence Schreiber of Deutsche Bank to Jim DiBiase shows that Mr. DiBiase's characterization of Mr. Schreiber's instruction in the memo, JX 73, is false. *See* DX 54. Mr. Schreiber makes clear in this fax that it was RRF, not Tiger, that would have had an interest in an entity like FFIP purchasing the shares. Mr. Schreiber states, with no other explanation, that "for structural reasons it is important that FFIP (or a similarly structured partnership) acquire at least $12.50 mm of the outstanding shares of Russian Recovery Fund LLC ("RRF"). *This ownership structure will facilitate future transactions that the RRF may wish to do.*" DX 54 (emphasis supplied). In light of RRF's interest in muting its own involvement in the subsequent sale to FFIP by Tiger, we do not think this mischaracterization is inadvertent.

Not only does Mr. DiBiase's mischaracterization call into question his candor, but Mr. Schreiber's solicitude to facilitate RRF's future transaction is equally odd, as his client was Tiger. The logical inference is that he was guiding the parties through a structured transaction, begun earlier, which had as its goal the preservation to FFIP, a tax-interested entity, of Tiger's losses, and we can assume this is the future transaction to which Mr. Schreiber was referring. In other words, to preserve the tax benefits of the Tiger transaction, a Bracebridge controlled entity interested in acquiring losses should buy out Tiger's interest in RRF. This is precisely what happened, of course, on June 3, 1999.[13]

On June 3, 1999, Tiger sold all of its RRF partnership shares to FFIP, a Bracebridge-controlled fund and partner within RRF, for a net amount of $14,088,196, which is approximately $800,000 less than the sales price of the shares roughly one to two weeks earlier.[14] It is undisputed, but we think noteworthy, that the market for derivative Russian securities like the OFZs had

---

[13] We do not ascribe any sinister intent to Mr. Schreiber in this regard, although we also suspect that his interest was in preserving the losses at a later date for General Cigar, with whom he had been in contact beginning at least in April, 1999. General Cigar had recorded a gain of over $200 million in 1998 and was looking for investment opportunities, including ways of "having capital losses to offset the gain." Tr. 954 (Ms. Krajewski).

[14] This represents a price per share in RRF of $47,555. Internally, RRF valued its shares shortly before the sale date at $58,868. JX 94; Tr. 486 (Mr. DiBiase).

gone up in that interim period.  The effect of this sale was that, pursuant to IRC § 721, FFIP could move into Tiger's shoes with respect to its contribution of Russian securities to RRF.  Whatever basis was attributable to Tiger at the time of the initial exchange in May was now traceable to FFIP upon the sale of the Tiger securities.

A letter agreement between RRF and Deutsche Bank concerning this sale was signed on June 24, 1999.  DX 88.  By the terms of that letter, Deutsche Bank agreed not to register the sale with the IRS as a tax shelter and in exchange, RRF agreed not to do anything to jeopardize the rights of future buyers from FFIP to step into its shoes for purposes of claiming FFIP's tax basis.  If RRF did anything to jeopardize the tax status of the transaction, it agreed to hold Deutsche Bank harmless for the consequences.

The third transaction concerns the purchase of the majority of the Tiger securities, now held by RRF, by General Cigar.  That sale occurred on June 22, 1999.  Once again, it was preceded by activities orchestrated by Laurence Schreiber.  An option executed on June 8th by RRF gave a fifteen day period to Deutsche Bank to sell up to 80% of RRF's OFZ 25023s at a strike price equal to a pro rata share of $14.5 million.  JX 87.  Deutsche Bank paid $50,000 for the option.[15]  On June 8th, Mr. Schreiber wrote to Ms. Krajewski and Joseph Aird, the CFO of General Cigar, that Deutsche Bank understood that "you are interested in acquiring a position in local Russian instruments for your investment portfolio. . . .  We have received a mandate from a holder of such assets to find buyers for their position."  DX 62 at 64.

DX 68 is a fax from Mr. Schreiber to Ms. Krajewski certifying that the Russian securities that General Cigar was about to buy from RRF (80% of the Tiger securities RRF held) for approximately $21 million through the good

---

[15] Defendant's experts devoted significant time trying to undercut the bona fides of this price.  Mr. Lucas argues that it was worth closer to $5 million, given the significant increase in the value of the assets, which in turn triggered the counter testimony of rebuttal expert, Nathalie Moyen.  We need not resolve whether Ms. Zimmerman was genuinely surprised and snookered by Deutsche Bank in the transaction, as she suggests, or was aware of the mispricing, as defendant suggests.  The balance of the evidence of RRF's knowledge of what was really happening is so overwhelming that it is immaterial to the outcome.

offices of Deutsche Bank would come with a built in tax loss of approximately $178 million.

The transaction between RRF and General Cigar was consummated on June 23-24, 1999, when Deutsche Bank exercised the option. In abbreviated form, it resulted in the sale of approximately 77% of RRF's holdings of OFZ 25023s to General Cigar for over $21 million. Ms. Krajewski testified that General Cigar was willing to pay all cash for the OFZs. Instead, Deutsche Bank made it clear that part of the purchase price should be paid in stock. The cost to General Cigar of $21.18 million thus consisted of cash in the amount of $17.950 million and preferred stock in General Cigar valued at $3.234 million. From this, Deutsche Bank ended up receiving a fee of $9,993,000, and RRF received the balance, $11.191 million, plus stock. As we shall see, the use of stock for part of the purchase price was used by RRF much later to assert additional losses on the transaction.

RRF sold its remaining 22.8% of the Tiger securities on the open market over four sales in 2000. Although it showed a profit of over $7,470,000 in appreciation in value from the acquisition in 1999, it claimed a loss on its 2000 partnership return on the sales of the securities in the amount of $49,786,826, reflecting 22.8% of the loss built into the exchange with Tiger. Later, in 2004, it claimed the balance of the loss ($170,909,000) on its redemption of its preferred stock in General Cigar.

In the fall of 1999, after the sale to General Cigar had concluded, Mr. Dibiase began working with Ernst & Young to prepare the 1999 tax forms for RRF. Two accountants, Henry ("Hank") Connelly and Joseph Bianco, worked closely with Mr. DiBiase. JX 118 is a February 1, 2000 fax from Mr. Connelly to Steve Shay, a tax attorney with Ropes and Gray, forwarding notes generated by Mr. DiBiase and Mr. Connelly during their conversations concerning DiBiase's "challenge" to get the losses to FFIP. In his notes of a conversation between himself, Mr. DiBiase, and Jim Nix, an attorney with Swidler & Berlin, who represented Bracebridge and RRF, Mr. Connelly records that the "Play to Tiger was that it got some cash whereas it would not have been able to receive any value." JX 118 at 17. We think a fair inference from this comment is that Tiger had been induced to do something. A "play" suggests an effort to attract someone. We also think that a fair inference is that the "something" was not the sale of RRF shares to FFIP, but the initial contribution of assets to RRF. The evidence regarding Tiger's sale of RRF shares, on the other hand, is that Tiger initiated the sale, and, according to

Nancy Zimmerman, this was an unwelcome surprise.[16]  If this was a surprise, then the "play" can only refer to the initial effort to line up Tiger's in-kind contribution.    Mr.  Connelly's  explanation  of  the  play  was  that  his "understanding was that Tiger had distressed assets that were very low in value, and Bracebridge has an expertise in dealing with distressed Russian assets.    Tiger  contributed  those  assets  to  a  Bracebridge  fund  so  that Bracebridge could manage those assets and extract the most value from them." Tr. 1293.  This makes no sense and bears no correspondence to the short statement, "play to Tiger was that it got cash, whereas it would not have been able to receive any value."[17]

We are entitled to presume that Mr. Connelly's contemporaneous notes are a more candid statement than Mr. DiBiase's about what it took to involve Tiger in the swap. There is absolutely no evidence that Tiger was looking to RRF to help "manage" its Russian assets.   As explained by some of defendant's experts, quite the contrary was the case.

II.     The Expert Witnesses

Five expert witnesses offered opinion testimony at trial, three for plaintiff and two for defendant.[18] These individuals were uniformly highly

---

[16] As discussed earlier, not long after contributing assets to RRF, Tiger approached Bracebridge about possibly selling its interest in RRF to a third party. Ms. Zimmerman testified that on the Tuesday following Memorial Day weekend, she "was told that Tiger was prepared to offer their shares in our fund at a discount in the market or to us. . . . [Tiger] intimated they had a buyer." Tr. 735-36.  We believe that the evidence clearly establishes that Ms. Zimmerman's state of surprise and displeasure was not due to Tiger's plan to exit the fund, but how quickly it wanted to execute that plan.

[17] In his deposition, Mr. Connelly was repeatedly asked if he was able to recollect what he meant by his note.  He was not able.

[18] Defendant also offered the testimony of Dr. John M. Lacey, a professor of accountancy at California State University at Long Beach.  We did not allow him to testify.  Our concern had nothing to do with his qualifications as an expert.  He is obviously highly qualified as an accountant and in evaluating financial statements, particularly of hedge funds.  We were

(continued...)

qualified. Much of their testimony, however, while not irrelevant, we find is ultimately not helpful in resolving the issues presented. We summarize the key portions below.

Dr. Steve Hanke has a PhD in economics and currently teaches at Johns Hopkins University. He is specialized in commodity and currency markets, and equity markets. In addition to teaching, he has been involved in managing hedge funds and advising foreign governments, including Russia, on managing their currencies. He was very knowledgeable, in particular, about the Russian currency collapse. He served on the President's Council of Economic Advisors in 1981 and 1982 as a senior economist. There is no question that he is a brilliant economist and well-placed to discuss the markets in sovereign debt in the late 1990's.

Dr. Hanke was called by plaintiff to explain the background to and effects of the 1998 Russian debt default and currency collapse. On August 15, 1998, the Russian banking system was suspended and payments were not made on outstanding sovereign debt. Capital controls were imposed on holders of S accounts (foreign debt owners). Their deposits were frozen initially so that rubles were not freely exchangeable for dollars. In March of 1999, rules were announced by the Russian central bank with respect to how debt holders could, using cumbersome means, eventually liquidate their Russian holdings. It was not until the end of 1999, after the government began to make arrangements for rescheduling the payment of sovereign debt, that markets began to normalize. In the interim, holders of Russian debt, or instruments derivative of Russian debt, such as the OFZ 25023 series at issue here, found it very difficult to convert their holdings into dollars.

Dr. Hanke endorsed RRF's strategy for trying to marshal Russian debt derivatives and manage them long-term with the hope of buying low and selling high. Although neither RRF nor any Bracebridge affiliate was itself an S account holder, he felt that Ms. Zimmerman's contacts with financial entities like Deutsche Bank, Credit Suisse, and others that did have access to the Russian exchanges enabled her to follow the market intelligently and perhaps

---

[18](...continued)
simply never given a satisfactory explanation as to what he was being offered to opine about of relevance here, except perhaps as to the ultimate legal issue of economic substance, on which we are content to omit his evidence.

take advantage of mis-pricing.  He also thought that accumulating assets in-kind made sense for RRF, rather than buying them with contributed cash.

Dr. Hanke testified on a number of other subjects, including the difficulty of pricing the OFZs and rubles, but in essence his contribution to plaintiff's presentation was that RRF had a legitimate business model.  We do not accept, however, his suggestion that Tiger was a logical customer for RRF's services.  As numerous witnesses testified, Tiger was one of the largest, if not the largest, operator of hedge funds during this time.  Its assets were over $20 billion.  It had no need of RRF's services.

In addition, the suggestion that Tiger needed to invest in RRF to diversify its Russian debt holdings also makes no sense.  At the time Tiger invested in RRF, there were only a handful of small investors.  When Tiger put its securities into RRF, they dwarfed RRF's other holdings.  RRF was left then with a portfolio composed almost entirely of OFZs of a single maturity date, September 12, 2001.

Dr. Hanke also did a "Monte Carlo" mathematical analysis to answer the question of whether Tiger's investment in RRF was "at risk."  This addresses the legal question of whether Tiger truly was a partner within RRF.  The result of Dr. Hanke's analysis suggests that Tiger stood to gain or lose, even in the brief period of time it was invested in the fund.  We have no reason to doubt the correctness of Dr. Hanke's calculations, but they have a highly artificial ring.  No one suggests that Tiger actually went through such an analysis to decide whether to invest.  Rather, the facts on the ground establish that Tiger was looking to get rid of its exposure to Russian debt by getting cash for its deflated asset as quickly as it could.  In addition, as Dr. David F. DeRosa, one of defendant's experts, points out, Tiger would have faced the possibility of gain or loss without turning over the Russian securities to RRF.  In fact, Tiger would have had a higher rate of return and lower loss by not incurring the fees attendant on joining RRF.

Dr. Hanke did not disagree with the major premise behind the testimony of defendant's experts, who, as we consider below, were of the view that Tiger would have been much better off simply holding on to the OFZs and riding them up in value.  This is exactly the way the market began moving right before Tiger contributed the OFZ 25023s to RRF.  This is not merely post hoc reasoning.  Tiger's actions were counterintuitive *at the time it received its RRF shares*.  If it made sense for Tiger to invest in RRF (something we reject),

then, when Russian sovereign debt began to recover in value, Tiger should not have bailed out, particularly when it settled unnecessarily for cashing out at a loss.

It is no answer to suggest, as Dr. Hanke does, that Tiger's "revealed intent" merely changed. We are entitled to ask whether any economic rationale suggests itself for the sudden shift in investment intent. We see none, other than a preconceived interest in cashing out its Russian assets.

Mr. Leon Metzger also testified on behalf of plaintiff. Mr. Metzger has an undergraduate degree from the University of Pennsylvania in economics and an MBA from Harvard University. His area of expertise is management of hedge funds. He has taught the subject and has been Vice President of a large hedge fund. We have no reservations about his qualifications to speak about the management of hedge funds. He began his testimony by endorsing the structure of RRF as a legitimate hedge fund. According to Mr. Metzger, nothing that RRF did in its organic documents was out of the ordinary, including its formation as a Cayman Islands partnership and its election to be treated for US tax purposes as a partnership. This allowed it to create opportunities for non-US entities as well as both tax indifferent and tax-interested US entities. He also endorsed RRF's scheme to compensate RRA for management services and the idea that a desire for receiving in-kind contributions was not unusual. Mr. Metzger also calculated RRF's rate of return at a very respectable 225% for 1999 and 105% for 2000.

In rebuttal to Mr. Christopher Lucas' testimony, which we discuss below, that Tiger merely wanted to cash out of its Russian position, Mr. Metzger testified that, if Tiger wanted cash, it simply would have kept its Russian debt instruments and tried to sell them itself.

The balance of Mr. Metzger's testimony amounted to a response to the testimony of Mr. Lucas or Dr. David DeRosa, two expert witnesses for defendant. Without questioning their qualifications, we do not rely on most of the points they made concerning RRF, except as considered below. Thus, it is unnecessary to lay out Mr. Metzger's responses.

The same can be said for virtually all of the testimony of Dr. Nathalie Moyen, a professor of finance at the University of Colorado. She is well acquainted with the world of derivatives and, like all of the other experts and a few of the fact witnesses, was able to explain the world of hedge funds,

derivatives, and sovereign debt. Indeed, an edited compilation of their testimony would make a fascinating textbook. Nevertheless, she was responding to testimony from Mr. Lucas and Dr. DeRosa that $50,000 was an artificially low price for the option purchased by Deutsche Bank to sell up to 80% of RRF's Tiger assets. Without questioning the quality of the points each made in their academic debate over using the Black-Scholes or Binomial Tree method of pricing options, it is unnecessary to resolve their disagreements in order to decide that Tiger was not a partner in RRF. In any event, their disagreements over option pricing must have amused Laurence Schreiber, who seems to be able to make lots of money without resort to such precise pricing methodologies.

Mr. Lucas testified for defendant. His primary opinion was that RRF was structured more as a tax shelter than as a legitimate hedge fund. He also was of the view that the option sale to Deutsche Bank was, in effect, bogus and not driven by real business considerations on the part of RRF. His third opinion was that RRF's marketing plan was too anemic to be credible. His fourth opinion was that the losses claimed by RRF ($223 million in total) are so disproportionate to its investment in Tiger assets (roughly $14 million) as to be unreasonable. We found Mr. Lucas to be a persuasive and knowledgeable witness. Even though he was not an academic—his business expertise is in hedge funds—he knew what he was testifying about. Nevertheless, to be clear, we find it unnecessary to accept any of these opinions in order to reach our findings below. The background he sets out for his opinions goes further into the transactions involved than we feel is necessary. The events here, including the formation of RRF, the transfer of Tiger's assets into RRF, the sale of RRF shares to FFIP, the option agreement, and finally the partial sale to General Cigar, may indeed have been orchestrated from beginning to end. However, we are prepared to assume that RRF was formed and marketed for legitimate business purposes, and we are prepared to ignore the details of the sale to General Cigar because we think that consideration of the Tiger-RRF portion of the transaction is sufficient to conclude that the loss cannot be recognized.

Mr. Lucas did, however, offer an opinion on a matter we believe to be highly relevant: Tiger's real interest in purchasing shares of RRF. Mr. Lucas testified that, in his view, this was a disguised sale. He explained that Tiger had sustained heavy losses in 1998, not just in Russian debt, but on an investment in US Airways and in Asian debt. Tiger shrank from a high of $22 billion in 1998 to approximately $6 billion in 2000, when it ceased operating

as a hedge fund.  Tiger needed cash to redeem investors who wanted to exit the fund.  Beyond that, the evidence he relied on to conclude that all Tiger wanted in mid-1999 was cash for its Russian debt is the evidence he heard at trial, which is evidence that the court is in the same position to evaluate, and which is evidence itemized above and summarized below.  In short, although Mr. Lucas is much better informed about business matters than the court, the evidence here, including Tiger's financial circumstances, is fully accessible by the court.  It is some comfort to have him on the same page as our ultimate conclusion, but we are reluctant to defer to an expert conclusion when we would not credit Mr. Lucas's conclusion without understanding and agreeing with the discrete elements of his inductive reasoning.

We also recognize one significant exception to our reluctance to rely on Mr. Lucas, however.  Mr. Lucas opined that RRF should have known, given its almost certain knowledge about Tiger's financial situation, that Tiger needed cash.  The uncertainty generated by this circumstance meant that Tiger's presence would make investment decisions more difficult.  Ms. Zimmerman should have been put on guard as well by Tiger's failure to do its due diligence about RRF.  She had reason to know, in other words, that the transfer for partnership shares, along with insistence on early redemption rights and a disavowal of investment intent, was a disguised sale.  None of plaintiff's experts responded directly to this testimony.

Finally, we have Dr. David DeRosa, who has a PhD in economics and finance from the University of Chicago, where he studied under Milton Friedman.  He has taught, written, and consulted in the fields of hedge funds, derivatives, and currency exchanges.  Dr. DeRosa has also been involved in setting up and running hedge funds himself.  He is highly qualified in these fields and well acquainted with Dr. Hanke, whose expert report he was hired to rebut, but who endorsed one of Dr. DeRosa's books, "In Defense of Free Capital Markets."  Dr. DeRosa offered two primary opinions: first, that the Tiger entities did not enter into the RRF transaction with the intention of holding the RRF interest as a long-term investment; and second, that a direct sale of the Russian securities would have been more desirable for the Tiger entities.  In addition, he offered associated opinions on more focused issues, such as the valuation of Tiger's contribution to the partnership and the valuation of the option obtained by Deutsche Bank.

Dr. DeRosa made plain his deep skepticism of the bona fides of the transaction, and we have no reason to question his skepticism.  We can agree

with him that Tiger did not enter into RRF with the intent of making a long-term investment. Also, Tiger would have been better off keeping the securities and trying to sell them independently. Dr. DeRosa may also be correct that the valuation of the assets was questionable and that Tiger did not do a meaningful due diligence prior to the trade. We are reluctant to place much reliance on these opinions, however. Ultimately, they only amount to skepticism. They are not sufficiently pointed, and they all generated responses from plaintiff's experts. In the end, Dr. DeRosa's points amount to circumstantial evidence that Tiger and RRF had another agenda.

Where we are more attuned to Dr. DeRosa's testimony, however, is with respect to his observation that Tiger gained nothing from the swap for RRF shares. If that is true, and we believe that it is, then the facade falls off the transaction. Dr. DeRosa explained, as did Mr. Lucas, that Tiger would have been better off if it had kept the shares because it had the ability to do its own market and asset analysis. In addition, Tiger would have known up front that it would be paying fees to RRA to manage the assets, plus it would have shared with RRA any increase in value. These would have been unnecessary expenses because Dr. DeRosa persuades us that RRF did not offer any management skills that Tiger itself did not already possess.

DISCUSSION

Normally, when an asset is sold or otherwise disposed of, loss or gain is determined at the time of disposition as the difference between the adjusted basis and the amount recovered. *See* 26 U.S.C. § 1001 (a), (c) (2012). Unstated but obvious is the assumption that the loss is claimed by the owner of the asset at the time of disposition.

An exception to this approach to claiming a loss, however, arises when assets are exchanged in-kind for an interest in a partnership. The statutory and regulatory[19] means by which the loss on an in-kind contribution is preserved

---

[19] In 2004, Congress changed the legal landscape somewhat in order to put a halt to perceived abuse of distressed asset transfers by amending section 704 to limit the basis of the property contributed to its fair market value at the time of contribution. *See Superior Trading, LLC v. Comm'r*, 137 T.C. 70, 79 (2011) (citing American Jobs Creation Act of 2004, Pub. L. No. 108-357, §

(continued...)

to the contributing partner is succinctly laid out by Judge Posner in *Superior Trading, LLC v. Commissioner,* 728 F.3d 676 (7th Cir. 2013):

> When an asset is contributed to a partnership, the contributor receives in exchange a partnership interest. The partnership formally owns the contributed asset, but the contributor owns a slice of the partnership in recognition of his contribution, and so hasn't really parted with the asset. In the hands of the partnership the asset's basis is the contributor's original basis, which (with adjustments that we can ignore) is the asset's original cost. 26 U.S.C. §§ 723, 1012. Recognition for tax purposes of gain or loss attributable to any change in the asset's value *before* the asset was contributed to the partnership is deferred until the partnership sells the asset. See 26 U.S.C. § 721(a). So if the asset is worth less than the contributor paid for it, that loss in value (what is termed "built-in loss") will be recognized, and thus usable to reduce taxable income, only when the partnership sells the asset. See 26 U.S.C. § 704(c)(1)(A) . . . . If the contributing partner sells his partnership interest before the partnership sells the contributed asset, the buyer of the partnership interest steps into his shoes and so recognizes built-in loss or gain if and when the partnership sells the asset. Treas. Reg. § 1.704–3(a)(7).

*Id*. at 679.

Plaintiff contends that the transactions at issue here properly followed this legal format. In other words, Jaguar and Ocelot sustained massive unrealized losses on their Russian assets and transferred those assets, along with their negative bases, in exchange for partnership interests in RRF. The losses did not need to be recognized on that exchange and became associated with the assets then acquired by RRF. Even then, only Tiger could have benefitted from those losses, as the contributing partner, but for the fact that its partnership interests were acquired by FFIP. FFIP then stood in Tiger's shoes when those losses were later dispersed when the assets were sold, in part

---

[19](...continued)
833, 118 Stat. 1418, 1589 (codified as amended at 26 U.S.C. § 704 (2006))).

to General Cigar and in part on the open market.  The validity of each step in this process, according to plaintiff, can be traced to provisions of the code.

The parties agree, however, that strict adherence to the procedural steps necessary to trigger the exception to immediate recognition of losses will not necessarily achieve the desired result of shifting the loss away from the tax-indifferent entity.  Courts have developed analytical filters to test whether a taxpayer should really benefit from certain statutory provisions.  Those inquiries or filters have evolved or have been applied in connection with many code provisions, including the sections involved here.  Because these inquiries are judicially-created overlays to the code, they are somewhat amorphous and in some respects overlap.  The FPAA and the government's argument here summon three of them:  sham partnership under the *Culbertson* test; lack of economic substance; and step transaction.

Judge Posner has neatly summarized how the sham partnership inquiry, for example, has been applied in DAD transactions:

> A genuine partnership is a business jointly owned by two or more persons (or firms) and created for the purpose of earning money through business activities.  If the only aim and effect are to beat taxes, the partnership is disregarded for tax purposes. . . .  "[T]he absence of a nontax business purpose is fatal." *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000).
>
> . . . .
>
> A transaction that would make no commercial sense were it not for the opportunity it created to beat taxes doesn't beat them. Substance prevails over form. . . . .  The question is "whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." *Commissioner v. Tower*, 327 U.S. 280, 287 (1946) . . . .

728 F.3d at 680 (citations omitted).  The sham partnership inquiry is also frequently cited to *Commissioner v. Culbertson*, 337 U.S. 733 (1949).  The Court there held that it can be appropriate to ask whether what appears to be a partnership was really just a matter of convenience for tax purposes:  The

court should inquire into whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Id.* at 742.  If not, then the partnership is ignored.  What is noteworthy about the *Culbertson* facts is that the Court remanded for a determination on a partner-by-partner basis whether the enterprise was bona fide.  The question, in other words, is not exclusively focused on the legitimacy of the partnership when it was formed; the entry of particular partners can also be questioned.

The Court of Appeals for the Federal Circuit in *Coltec Industries, Inc. v. United States*, explained the rationale behind the economic substance test:

> The economic substance doctrine represents a judicial effort to enforce the statutory purpose of the tax code.  From its inception, the economic substance doctrine has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit.  In this regard, the economic substance doctrine is not unlike other canons of construction that are employed in circumstances where the literal terms of a statute can undermine the ultimate purpose of the statute.

> . . . .

> The Supreme Court, various courts of appeals, and our predecessor court, have identified a number of different factors pertinent to the determination of whether a transaction lacks economic substance and thus should be disregarded for tax purposes. We understand the economic substance doctrine to incorporate the following principles.

> First, although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality.  This principle emerged early on in *Gregory* [*v. Helvering*, 293 U.S. 465 (1935)], where the Supreme Court disregarded intermediate transfers of stocks as falling outside the tax code because the transfers had "no

27

business or corporate purpose" and performed no "function" other than to reduce taxes.  293 U.S. at 469. . . .

While the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance.

Second, when the taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance.  In describing the history of the economic substance doctrine, our predecessor court in *Rothschild* stated, "Gregory v. Helvering requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance."  407 F.2d at 411 (quoting *Diggs v. Comm'r of Internal Revenue*, 281 F.2d 326, 330 (2d Cir.1960)). . . .

Third, the economic substance of a transaction must be viewed objectively rather than subjectively.  The Supreme Court cases and our predecessor court's cases have repeatedly looked to the objective economic reality of the transaction in applying the economic substance doctrine.  While the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose, all courts have looked to the objective reality of the transaction [in] assessing its economic substance. . . .

Fourth, the transaction to be analyzed is the one that gave rise to the alleged tax benefit. . . . [I]n economic substance cases, the focus is on "the specific transaction whose tax consequences are in dispute," [*Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006)], and the Second Circuit has stated that "[t]he relevant inquiry is whether the transaction that generated the claimed deductions . . . had economic substance," *Nicole Rose Corp. v. Comm'r of Internal Revenue*, 320 F.3d 282, 284 (2d Cir. 2003). . . .

Finally, arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny.

454 F.3d 1340, 1353-57 (Fed. Cir. 2006) (select citations omitted).

The third test defendant relies on to disallow the losses is the step transaction inquiry. This is laid out in *Commissioner v. Clark*, 489 U.S. 726 (1989), as follows:

Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction. By thus "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," federal tax liability may be based "on a realistic view of the entire transaction."

*Id.* at 738 (citing 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 4.3.5, p. 4-52 (1981)).

As is obvious, the three tests (sham partnership, economic substance, and step transaction) are closely related, and courts frequently use similar language in implementing them.

In addition to this judicial gloss on the statutes on which plaintiff must rely to claim the loss, defendant points to regulations of the Internal Revenue Service that address the same concerns. In 1994, the agency adopted the Subchapter K Anti-Abuse Rule, 60 Fed. Reg. 23 (Jan. 3, 1995) (codified at 26 C.F.R. § 1.701-2). They provide, in essence, that the partnership must be bona fide and entered into for a substantial business (i.e., not purely tax) purpose. *See* Treas. Reg. § 1.701-2. Not only must the partnership be bona fide, but each partnership transaction or series of transactions must be entered into for a substantial business purpose. *Id.* § 1.701-2(a)(1)-(3). A series of transactional steps that independently make no economic sense do not, by a gestalt process, result in one larger legitimate transaction.

Defendant contends that Tiger had no business purpose in acquiring shares through a contribution in kind to RRF, that it was never a real partner in RRF, and that the swap of assets for partnership shares should be ignored so that what emerges is simply a sale of the OFZ 25023s by Tiger to FFIP. If

any of these related criticisms are correct, then RRF could not claim Tiger's original basis in the Russian securities.

The government also questions the original formation of RRF, the bona fides of the option agreement between Deutsche Bank and RRF, and the subsequent sale to General Cigar.  If it is correct in its challenge to the bona fides of the Tiger-RRF transaction, it becomes unnecessary to examine activities prior or subsequent to that transaction.  If RRF did not acquire the Tiger assets through a legitimate section 721 contribution, then RRF acquired a new and lower basis in the securities and had no built in losses to use or pass along.  When a horse is dead, there is no point flogging it further.  In our judgment, this is a dead horse.

I.   Tiger's Contributions to RRF Were Not Valid Under Section 721

To summarize, on May 19, 1999, Tiger owned Russian securities that had lost approximately $223 million in value.[20]  By June 24, 1999, those assets were owned either by Russian Recovery Fund (22%) or General Cigar (78%). Those two entities later sold the Tiger assets at a gain, but claimed between them losses on disposition of approximately $360 million.  It does no injustice to plaintiff to observe that, in substance, Tiger suffered the loss but even greater losses were claimed by RRF and General Cigar, which both gained on the sales.  As it turns out, sometimes things really are too good to be true.

The limited question before us is whether the FPAA adjusting RRF's partnership return for 2000 was correct in its conclusion that the claim of approximately $49 million in losses for a portion of these Tiger assets was inappropriate.  To state the question different, did Tiger's losses travel intact through the series of transactions at issue and legitimately flow to RRF's partners by way of the K-1 forms,[21] or, as defendant asserts, did the built-in loss vanish immediately at Tiger's transfer to RRF because this was a

---

[20] If it had sold those assets in May, Tiger would have realized a loss of approximately $223 million, but as a non-U.S. taxpaying entity, it would not have been able to utilize those losses to offset income as is permissible under the U.S. tax code.

[21] For completeness, we could enlarge the question to include whether the losses also passed to General Cigar, but that is not directly implicated in this RRF partnership adjustment challenged by the complaint in this case.

disguised sale. Although section 721(a) allows non-recognition of gain or loss at the time of an in-kind contribution "in exchange for an interest in the partnership," we agree with the government that Tiger had no real intention of becoming a partner in RRF, and that RRF had reason to know that. A review of the evidence demonstrates that Tiger and RRF were not partners and their transaction was a sham, that the transaction lacked economic substance, that the contribution can be ignored, and that the transaction should be characterized as a sale.

The Supreme Court in *Culbertson* held that the test for whether a genuine partnership was formed is whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." 337 U.S. at 742. We believe that this test applies not just to the initial formation of RRF, but to the subsequent acquisition by Tiger of a partnership interest in RRF.

This matters because Ms. Zimmerman persuaded the court that she had a legitimate business interest in creating RRF. Her explanation of her evolution as a fund manager was a tour de force, which reflected real knowledge of a wide range of investment strategies and vehicles. She has obviously been very successful in the formation of funds and in their performance. Her explanation of the opportunities she saw after the collapse of the Russian bond market and associated securities was not contrived. We find that she was genuinely interested in putting together a fund to attract investors that already owned or were interested in owning devalued Russian assets because she saw the potential for making money for Bracebridge as a fund manager.

We are prepared to accept, in other words, the bona fides of RRF as an entity and that its marketing efforts in the first half of 1999 were probably a genuine effort to find investors in the "macro play" of capitalizing on a hoped-for increase in value of distressed Russian assets. Thus far, so good. The wheels fall off, however, when we come to the Tiger transaction.

We believe the evidence is clear that Tiger was interested in the spring of 1999 in selling its position in OFZ 25023s. Anu Murgai, a Tiger employee in 1998 and 1999, testified by deposition. DX 205. Her position was that of an execution trader, which meant she executed the orders of others to buy or sell securities on Tiger's account. When asked to characterize the transactions at issue, i.e., Tiger's transfer of Russian assets to RRF, she referred to them as

sales.[22] We recognize that she had no independent authority to make decisions about Tiger's trades and that her recall of events in 1999 was weak. Nevertheless, we deem her testimony relevant because it is her candid characterization of what she thought she was being directed to do.

Similarly, we have the deposition testimony of Michael Treisman, current general counsel to Tiger.[23] PX 62. He made the following statements concerning Tiger's desire to liquidate its Russian holdings:

1)      I think the goal of the contribution [exchange of Tiger's assets for shares in RRF] was at some point to receive cash value for the interests . . . .

2)      Tiger was considering . . . how to as quickly as possible realize cash consideration for its investments in the Russian-linked instruments . . . .  Tiger was looking to receive cash for its interests on as fast as or as in quick a possible manner as that could be provided. . . .

3)      [I]n 1999 Jaguar and Ocelot did contribute [their] shares of interests in some of these instruments to the Russian Recovery Fund which would constitute a sale from my perspective.

PX 62 at Dep. Tr. 133, 135, 138.

---

[22] *See, e.g.*, DX 205 at Dep. Tr. 67 ("Q. Do you recall what Tiger did with its Russian bonds after the default?  A. We sold them."); Dep. Tr. 86 ("Q. Do you recall what you discussed [with Nancy Zimmerman]?  A. I think this is something about whether we were looking to sell Russian bonds."); Dep. Tr. 115 ("Q. After the default by Russia . . . was it Tiger's intent to liquidate their Russian holdings?  [Objection omitted.] . . . .  A. Yes, I think . . . we were liquidating. . . .  [S]elling them.").

[23] Mr. Treisman was not employed by Tiger during the relevant time period.  He prepared himself for his deposition on behalf of Tiger by consulting various knowledgeable individuals and the parties agreed to use his deposition in lieu of live testimony.  *See* Rules of the Court of Federal Claims ("RCFC"), Rule 30(b)(6).

Tiger's insistence on negotiating an early exit and its refusal to certify an investment intent are further proof that it had no real interest in becoming a partner in RRF.   Tiger's intent was also made clear by its statements following the contribution of assets.  On May 24, virtually simultaneous with getting into RRF, Tiger was planning to sell its RRF shares for cash:

> [W]e sold all of our sep 2001 bonds (that we had . . . with deutsche bank) in return for equity in the russian recovery fund. [T]he value of the equity at the time we received it was 14mm dollars. [H]owever, we plan to sell in equity in 2 weeks to hopefully receive cahs [sic].

DX 43 (email from Ms. Murgai to other Tiger employees).  Another internal communication written on May 25th, indicates that:

> Jaguar and Ocelot Cayman have assigned their interests in Russian 9/12/01 OFZ's (held with Deutsche Bank) to a private fund called the Russian Recovery Fund. . . . The current value of the fund is approximately $14 million dollars.  We hope to have private fund shares sold, vs. cash, in approximately two weeks.  Update to follow.

DX 46 (internal Tiger posting memorandum).  Tiger was looking to cash out of its position in OFZ 25023s as quickly as possible, and from Mr. Treisman's perspective, the transaction amounted to a sale.[24]

Also, defendant's experts persuade the court that Tiger's entry into RRF made no sense as an investment, and its exit made no sense in terms of timing. Both Dr. DeRosa and Mr. Lucas testified that Tiger had more in-house capability to deal with sovereign debt, including Russian debt, than RRF. Tiger had no need to buy RRF's expertise when it was already paying its own experts.  As Dr. DeRosa put it, "anything that [RRF] could have done for [Julian Robertson,] he could have done in his own portfolio."  Tr. 2577.  It was

---

[24] This is consistent with the testimony of William R. Goodell, Tiger's prior general counsel, who agreed that "the intent of Tiger was to liquidate the Russian investments and obtain cash."  DX 206 at Dep. Tr. 24.  It is also in line with Mr. Schreiber's testimony at trial when he agreed that "Tiger was looking to sell its Russians bonds."  Tr. 3278.

paying for nothing, in other words. It was gaining nothing in terms of economies of scale or diversification because even the remotest due diligence would have disclosed that the OFZ 25203's would constitute the vast bulk of RRF's portfolio. Finally, as Dr. DeRosa pointed out, by joining RRF, whatever lockup period that Tiger was subject to, even if negotiated down from three years, was a lockup period to which it was not subject prior to joining RRF. We accept his opinion that Tiger had no practical reason to join the partnership and that, in the final analysis, "the Tiger entities' actions were consistent with those of a seller of the at-issue securities, not a long-term investor." Tr. 2586. We note, moreover, that as Mr. Lucas explained, all of the momentum with respect to Russian debt in May and June of 1999 was in the direction of recovery of value. It would have made no sense to sell the shares at that time unless it was part of a pre-arranged deal to cash out Tiger's OFZ 25023s. The only conclusion is that Tiger had no real interest in becoming a partner in RRF and that it was using the exchange as a way to dispose of its Russian assets for cash, as quickly as possible.

Plaintiff's response to this evidence amounts to a retreat to formalism: "The central question in this case is whether the Tiger Funds were partners in RRF." Pl.'s Post-Trial Mem. Law 24. It takes the position that the court is obligated to accept at face value the paperwork executed by RRF and Tiger because these documents mean that "[t]he Tiger Funds contributed the Tiger Assets in exchange for RRF Shares." *Id*. Plaintiff also asserts that "[d]uring the period they held their investment, the Tiger Funds obtained the benefits and suffered the burdens of owning a partnership interest in RRF [and] . . . . [u]nder Federal Circuit law, that makes the Tiger Funds the owners of RRF partnership interests for U.S. federal income tax purposes." *Id.* Essentially, plaintiff argues that Tiger and RRF were partners because they observed the formalities. If Tiger was a partner, then no matter how long it stayed in RRF, its investment was at risk because its investment could have dropped in value, or alternatively, it could have gone up.

Plaintiff makes no real effort to address the large body of case law which requires a look beyond these formalities. Instead, it relies heavily on IRC § 704(e)(1):

> e) Family partnerships.--
>
> > (1) Recognition of interest created by purchase or gift.--A person shall be recognized as a partner for

purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

Plaintiff views this statutory provision as supporting an inquiry independent of the judicially created challenges to over-reliance on formalism. We disagree for two reasons. First, although admittedly there is some debate on the question, we believe that the provision, as its name suggests, is directed at preventing the IRS from undoing intra-familiar partnership transactions, something far afield from the Tiger-RRF transaction.[25] Second, even if the provision is of broader application, there is no reason to think Congress intended to insulate taxpayers from decades of judicial scrutiny into abusive reliance on formalism.

As defendant correctly points out, the IRS has adopted regulations interpreting section 704(e)(1) that preserve the traditional inquiries into whether the creation of a partnership interest was a sham transaction. Treas. Reg. § 1.704-1(e)(1)(iii) ("A . . . purchaser of a capital interest in a partnership is not recognized as a partner under the principles of section 704(e)(1) unless such interest is acquired in a bona fide transaction, not a mere sham for tax avoidance or evasion purposes . . . ."). Section 704(e)(1) plainly does not insulate plaintiff from the assertions made in the FPAA.

We conclude, in sum, that the FPAA adjustments were correct. Tiger was never a bona fide partner in RRF. The economic substance of what it did, if the interim step of becoming a partner in RRF is ignored as window dressing, is sell its securities to FFIP. This means that FFIP did not inherit Tiger's basis with its built-in losses. Accordingly, the taxpayer owes the disputed taxes.

Our conclusion that Tiger was never a real partner in RRF is arguably sufficient by itself to undo the loss carryover. We would not recognize the transaction as anything other than a sale because that is what Tiger intended

---

[25] In that respect it was a reaction to *Culbertson*, which did involve a family partnership. *See* S. Rep. 82-781, at 38-40 (1951) (noting that IRC § 704(e)(1) was intended to "harmonize" the rules regarding family partnerships, particularly in light of the confusion caused by *Culbertson* and its progeny).

it to be.  However, there is a massive amount of circumstantial evidence that RRF was aware early on that Tiger had no real interest in becoming a partner, and was a willing participant at some point in facilitating the transfer of assets through the sham partnership.

The quickest means of seeing the events in focus is to step back and look for the actions of the common denominator, Deutsche Bank.  It was the broker who helped Tiger acquire its Russian assets.  It linked Tiger with the Bracebridge funds.  It helped arrange the transfer of the Tiger assets to RRF.  It brokered the sale of Tiger's partnership interest in RRF to FFIP, in the process making certain that the form of that sale did not jeopardize the subsequent transfer of the built-in losses to a third party.  It then obtained an option to sell the OFZ 25023s from RRF and finally arranged a sale to General Cigar.  The evidence clearly indicates that RRF was a knowing and willing participant in these activities, at least as of April 1999.

Bracebridge funds had been a client of Deutsche Bank before the creation of RRF.  Tr. 3286-87 (Schreiber).  Jon Grenzke contacted Deutsche Bank in December 1998, during the initial marketing effort for RRF, so we know that two key players were acquainted from the time RRF was formed.  In addition, when asked to explain a rather suggestive email discussed below, Mr. DiBiase testified that:

> [S]tarting probably early in 1999, we were having conversations with counter[-]parties . . . like . . . Deutsche Bank . . . and we were hearing from them that . . . there may be potential buyers for these depreciated Russian assets in the market because they were attracted to the fact that these securities had these large built-in losses and that perhaps there could be a trade structured in some way to transfer some of the tax characteristics, which these buyers were attracted to, . . . to extract some value from those trades related to the tax characteristics of those assets. . . . [T]here was this theme at the time that there may be – there may be some value embedded in these assets over and above sort of the pure . . . investment valuation that we were attributing to . . . the MICEX price divided by the exchange rate. . . .

Tr. 208-09.  Mr. DiBiase explained that RRF "never really pursued this specifically," Tr. 210, however, and that the subsequent trades between Tiger and RRF, and then RRF and General Cigar, were not conceived with built-in

losses in mind.  We find this assurance implausible.  We know that Mr. DiBiase and Ms. Zimmerman, despite their modest disavowals of knowledge of tax laws, were more than aware of the basics necessary to move tax losses around, that they were aware of the issue, and that they had tax lawyers from whom they were seeking advice on this issue from the inception of RRF.

Ms. Krajewski of General Cigar testified that, in the spring of 1999, her company was being courted by unsolicited suggestions of investment opportunities, not just to put over $200 million to work for General Cigar, but also possibly to shield that gain with acquired losses.  Nancy Zimmerman visited General Cigar that spring, and she recalled that her purpose was to persuade General Cigar to invest directly in a Bracebridge fund.  She was unsuccessful.

Nevertheless, someone was pressing Russian bonds on General Cigar in the spring of 1999, presumably Deutsche Bank, and one of the reasons was for "tax benefits," specifically to "acquire the higher tax basis."  Tr. 966 (Krajewski).[26]  Ms. Krajewski recalls that the bonds being considered are the ones later purchased from RRF.  On April 20, the General Cigar board of directors approved the idea of buying $25 million in "Russian bonds."  Tr. 961 (referring to DX 20).  On April 27, 1999, Mr. Schreiber emailed Ms. Krajewski with pricing information about Russian bonds, including specifically OFZ 25023s.

The emails of April 30, 1999, from Mr. DiBiase to Ms. Zimmerman, only make sense as part of the plan (of which they were fully aware) to move highly depreciated assets to RRF via Deutsche Bank in a way that preserved their tax characteristics.  Mr. DiBiase's email of May 14, before the Tiger transaction was consummated, candidly refers to "one of our most valuable assets" as the built-in losses.  He retrospectively stated in the July 23 email that "we didn't want rrf to have significant level of corporate ownership since people interested in buying tax losses don't want to transact with corporations." DX 111.  This was an equally candid admission that preserving tax losses was a RRF goal prior to Tiger's entry into the partnership.

---

[26] *See also* Tr. 965 (Krajewski) (reflecting that the court asked Ms. Krajewski to explain a reference in DX 20 to a transaction that would provide tax benefits, specifically asking, "What would the potential tax benefit be?," to which she replied, "Well, . . .   The bonds were highly discounted").

We find it more likely than not that Laurence Schreiber orchestrated the series of transactions in a way that the Bracebridge organization and General Cigar would not only get the OFZ 25023s but would obtain them in such a way that Tiger's losses would flow from Tiger to those entities.  His fax of June 1 is illuminating.  In it, Mr. Schreiber told Mr. DiBiase that, "for structural reasons it is important that FFIP (or a similarly structured partnership) acquire at least $12.50 mm of the outstanding shares of Russian Recovery Fund LLC ("RRF").  This ownership structure will facilitate future transactions that the RRF may wish to do."  DX 54.  The only plausible reading of this instruction is that Deutsche Bank was eager to preserve the losses for a planned future sale to General Cigar.  Mr. DiBiase apparently needed no explanation for what Mr. Schreiber had in mind, and the purchase by FFIP was obviously arranged to preserve the losses intact.  In sum, Deutsche Bank was not acting alone, at least as early as April, 1999.

Tiger *and* RRF thus collaborated in a scheme to use the tax laws to their advantage.  While we can express a grudging admiration for the cleverness involved in stringing together these transactions to track the tax code, we are not obligated to give them effect when their sole intent was to avoid treating the May transaction as what it was, a sale.  Whether RRF is also liable for penalties, we address below.

II.      Penalties

The FPAA disallowed approximately $50 million in losses claimed by RRF on its 2000 partnership return.  In addition, the IRS levied a 40% penalty for, among other things, "gross valuation misstatement," pursuant to IRC § 6662.  Plaintiff has the burden of challenging this penalty, and does so here, in principal part, by arguing that it reasonably relied on tax advice.  *See* § 6664(c)(1) ("No penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause . . . and that the taxpayer acted in good faith . . . .").

Plaintiff received auditing and tax preparation services from Ernst & Young ("E & Y").  Mr. Connelly, an accountant at E & Y, had been preparing returns for Bracebridge for several years before he was contacted in October 1999 by Jim DiBiase who asked him to prepare a return for RRF as well.  Mr. Connelly's specialty is the taxation of hedge funds, and more particularly, taxation of hedge funds operating as partnerships.  He prepared RRF's 1999

and 2000 form 1065's.  Mr. Connelly was the senior manager assigned to the returns, meaning he signed them on behalf of E & Y, although he operated under Dom LaValla, the partner assigned to Bracebridge.  Joseph Bianco, an attorney and manager at E & Y, assisted Mr. Connelly in preparing the returns.  At trial, Mr. Bianco testified that he preformed the initial review of documents and financial statements provided by Bracebridge.  Mr. Connelly recalled that he relied on Mr. Bianco to gather information and do the initial calculations.

During the information gathering stage, Messrs. Connelly and Bianco worked closely with Mr. DiBiase, who provided the documents and facts that would collectively lay the foundation upon which the accountants would prepare RRF's returns.  The trial exhibits bear out this relationship.

JX 101 is an email dated October 7, 1999, in which Mr. Connelly solicited help from Mr. Bianco in addressing the RRF return.  Attached is a memorandum containing a list of events relevant to the relationship between RRF and the Tiger funds.  *Id*. at 54.  As with this and all subsequent information about the transactions, the E & Y accountants relied on Mr. DiBiase for the facts.  We note here that, despite his reticence in claiming any extensive understanding of tax matters, we believe Mr. DiBiase was being unduly modest.  He had extensive experience in preparing tax returns for former employers and showed a remarkable interest in and understanding of the relevant factors in moving Tiger's tax losses to FFIP.  We believe that the list of working "facts" behind E & Y's preparation of RRF's tax return were orchestrated by Mr. DiBiase to achieve a desired result and were not critically evaluated by either Mr. Connelly or Mr. Bianco.

JX 104, for example, an email in the continuing evolution of the "facts" supporting the tax deduction, forwards an attached chronology of RRF events, including the following:

2.  Tiger contributes assets in kind to RRF.  May 20, 1999 **Non taxable** (721(a))

3.  FFIP buys Tiger's shares in RRF.  June 4, 1999  **FFIP's basis = Cost (1012)**

4.  In exchange for 80% of the assets contributed by Tiger, RRF receives stock and cash from [General Cigar].  June 23, 1999 **Nontaxable (351)**[.]

39

*Id*. at 56.  Mr. Connelly testified that the underlying chronology was prepared by Mr. DiBiase.   When asked whether the notations in bold concerning non-taxability were added by E & Y, Mr. Connelly answered, "We didn't provide information to Mr. DiBiase" and that he received the attachment in the precise form it was introduced at trial.  Tr. 1265.  Mr. DiBiase, in other words, was thoroughly familiar with the finer workings of the code and was taking no chances in guiding the E & Y team along.  Mr. Connelly testified consistently that all the information upon which E & Y relied came from Mr. DiBiase.  Despite E & Y's non-involvement in the formation of RRF, Messrs. Connelly and Bianco did not ask for basic information about how the fund was organized or how Tiger became a partner.

Similarly, on November 9, 1999, Mr. DiBiase sent Mr. Connelly an email composed of six background facts, of which item three was the purchase of Tiger's RRF shares by FFIP and items four through six concerned other dealings between Bracebridge entities ending with the contribution by FFIP of its RRF shares to FFI Fund.  JX 118 at 15.   Mr. DiBiase ended with a "challenge" to the accountants: "Get tax losses from 25023 to FFIP.  Don't want any of such losses to be allocated to other entities which will get no benefit from them."  *Id*.

In September 2000, Mr. DiBiase sent a final version of the background facts to Mr. Connelly, who had apparently been asking for this information for at least six months.  *See* JX 124.  When asked what recitations he was looking for to confirm the non-taxability of the Tiger contribution, Mr. Connelly explained that he wanted assurances that Tiger had made a contribution, that there was an economic reason for the contribution, and that the subsequent transfer to FFIP was not related to or premised on the contribution.  Nevertheless, the communications between E & Y and Mr. DiBiase, along with the trial testimony, suggests an uncritical acceptance by E & Y of the information provided by Mr. DiBiase.  The memo authored by Mr. Dibiase provides virtually no information about the economic "reason" for Tiger's contribution or about the independence of the subsequent transfer.  *Id*. at 8.  E & Y simply took at face value Mr. DiBiase's self-interested summary and utilized these "facts" to prepare the tax forms.

The facts, however, should have given the accountants at least some cause for concern.  The difference between the sales price ($14.9 million) and the built-in losses ($223 million) should have triggered some conversation

about the bona fides of Tiger's brief sojourn within RRF.  Mr. Connelly wrote himself a note at the time to prompt himself to ask Mr. DiBiase "why buyout of Tiger."  JX 118 at 15.  At trial he testified that he did not recall what answer he received from Mr. DiBiase to that very relevant question.  Also in his notes of the conversation he had with Messrs. DiBiase and Shay were the following comments: "Presumed not to be a prearranged transaction," and "Shay –ACM concern."  *Id*. at 19.  "ACM" was a reference to a case issued by the Court of Appeals for the Third Circuit in 1998 that upheld in part the Commissioner's FPAA challenge to a partnership transaction for lack of economic substance. *See ACM P'ship v. Comm'r*, 157 F.3d 231 (3d Cir. 1998).  While one would expect to see legal memoranda, advice letters, or other work papers addressing these issues, nothing was produced at trial to show how E & Y resolved these concerns.  Mr. Connelly testified that he did nothing other than accept Mr. DiBiase's representation that the contribution by Tiger and sale to FFIP were presumed not to have been prearranged transactions.

E & Y did not investigate the motivations for the sale by Tiger to FFIP within two weeks of Tiger's initial contribution, by which Tiger took an $800,000 loss at a time of rising markets for Russian securities.  Additionally, there is no evidence that E & Y asked for or critically read the papers describing the circumstances behind Tiger's contribution to RRF, specifically the side agreement with its negotiated change of Tiger's commitment from three years to six weeks or the subscription agreement with its disavowal of any investment intent.

Although there is no evidence that the tax accountants at E & Y performed an independent investigation into the transactions at issue, plaintiff asserts that Bracebridge, including RRF, also employed the auditing division at E & Y to inspect the records and books of the partnership.  Plaintiff makes much of the fact that RRF was given an "ok" in an E & Y audit and that the audit division was supposed to share its findings with the tax division.  There is no such evidence in the record; however, and, in any event, we would have no better basis for assuming that the audit division scrutinized the formation documents.  In short, the tax division at E & Y relied virtually exclusively on Mr. DiBiase's characterization of the facts.

Finally, the only record plaintiff offers of "advice" given to RRF concerning the propriety of taking the losses is the returns themselves.  There are no backup memos or records of conversations concerning the propriety of claiming the built-in losses.  We are simply asked to accept that, by signing off

on the returns for 1999 and 2000, E & Y was giving its considered advice on whether it was appropriate to take the loss deduction.

We are satisfied that neither Mr. Connelly or Mr. Bianco did any independent investigation into the validity of the critical assumption underlying FFIP's claim to the built-in losses suffered by Tiger—that Tiger was a bona fide partner. They simply accepted Mr. DiBiase's well-orchestrated plan for having the firm endorse the losses. In a field of tax law that is laden with judicial exceptions to the nominal application of statutes, including cases that specifically question the use of carryover bases in distressed asset sales, E & Y did not consider the application of judicial precedent.

The accountants were entitled to rely on information coming from the client in filling out the tax returns, but this is not what the law contemplates as due diligence when it comes to thwarting a penalty for gross underpayment of taxes. *See Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1381-82 (Fed. Cir. 2010). Plaintiff is liable for the penalty because it did not reasonably rely on objective advice from a tax professional based on all of the pertinent laws, facts, and circumstances.

CONCLUSION

We reject RRA's challenge in case number 06-30 to the IRS's disallowance of the Tiger losses. In addition, we sustain the imposition of penalties. Therefore, plaintiff is not entitled to a correction of the 2000 FPAA. The complaint in case number 06-30 and the complaint in case number 06-35 (which contains the same allegations asserted by a second and alternative tax matters partner), are dismissed with prejudice and the Clerk is directed to enter judgment for defendant, except to the extent set forth in the Court's Opinion (Doc. #155) granting, in part, and denying, in part, both plaintiff's motion for partial summary judgment (Doc. #120) and defendant's cross-motion for partial summary judgment (Doc. #127).

In its Opinion (Doc. #155), the Court held:

(1) that the general three-year period of limitations (set forth in 26 U.S.C. § 6501(a)) for assessing taxes (plus penalties and interest) attributable to any partnership item or affected item for the 2000 taxable year of RRF was suspended and remains open for all taxable years with respect to which a direct

and/or indirect partner of RRF filed a tax return either (1) within (i.e. equal to or less than) three years before the IRS issued the FPAA on October 14, 2005, or (2) on or after the date (October 14, 2005) the IRS issued the FPAA, including (a) for the 2001 taxable year with respect to which a direct and/or indirect partner filed a tax return on or after October 14, 2002, (b) for all taxable years subsequent to 2001 (e.g. 2002-2014 and beyond), and (c) for any taxable year with respect to which the period to assess is measured by an open taxable year identified above in (a) or (b) (for example: all taxable years (e.g. 1997 to 2001) for which an RRF indirect partner used (ordinarily on an amended return) a carryback that was created in a taxable year identified above in (a) or (b), see 26 U.S.C. § 6501(h));

and

(2) that the general three-year period of limitations (set forth in 26 U.S.C. § 6501(a)) for assessing taxes (plus penalties and interest) attributable o any partnership item or affected item for the 2000 taxable year of RRF has expired (i) for the 2000 taxable year with respect to which a direct and/or indirect partner of RRF filed a tax return before October 14, 2002, (ii) for the 2001 taxable year with respect to which a direct and/or indirect partner of RRF filed a tax return before October 14, 2002, and (iii) for any taxable year with respect to which the period to assess is measured by a taxable year identified above in (i) or (ii). All such years are therefore closed for assessment under the general three-year period of limitations (set forth in 26 U.S.C. § 6501(a)), but may be open for assessment where a period of limitations other than that three-year period applies, for example, an agreed period under 26 U.S.C. § 6501(c)(4), a carryback period under 26 U.S.C. § 6501(h), etc.

No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge